817 So.2d 819 (2002)
In re CONSTITUTIONALITY OF HOUSE JOINT RESOLUTION 1987.
No. SC02-194.
Supreme Court of Florida.
May 3, 2002.
*821 Joseph W. Hatchett, J. Thomas Cardwell, Richard A. Perez, and Robert J. Telfer, III of Akerman, Senterfitt & Eidson, P.A., Tallahassee, FL; Miguel DeGrandy and Stephen M. Cody of Miguel DeGrandy, P.A., Miami, FL; and George N. Meros, Jr. and Jason L. Unger of Gray, Harris & Robinson, P.A., Tallahassee, FL, on behalf of Tom Feeney, Speaker of the Florida House of Representatives.
Barry Richard of Greenberg Traurig, P.A., Tallahassee, FL, and James A. Scott, Edward J. Pozzuoli, and Alexis M. Yarbrough of Tripp Scott, P.A., Fort Lauderdale, FL, on behalf of John McKay, President of the Senate.
Robert A. Butterworth, Attorney General, Paul F. Hancock, Deputy Attorney General, and George L. Waas, Senior Assistant Attorney General, Tallahassee, FL, on behalf of the State of Florida.
W. Dexter Douglass and Thomas Porter Crapps of the Douglass Law Firm, P.A., Tallahassee, on behalf of Common Cause Florida and the Florida League of Women Voters.
*822 Gregory T. Stewart, Harry F. Chiles, Carrie Mendrick Roane of Nabors, Giblin & Nickerson, P.A., Tallahassee, FL; and James G. Yaeger, Lee County Attorney, Fort Myers, FL, on behalf of Lee County, FL, and Bob Janes, Douglas R. St. Cerny, Ray Judah, Andrew W. Coy and John E. Albion, individually and as members of the Lee County Board of County Commissioners.
Stephen H. Grimes and Susan L. Kelsey of Holland & Knight, Tallahassee, FL, on behalf of Marion County, FL, and the City of Ocala, FL.
Samuel S. Goren, Michael D. Cirullo, Jr., and David N. Tolces of Goren, Cherof, Doody & Ezrol, P.A., Fort Lauderdale, FL, on behalf of the City of Pembroke Pines, FL.
Representative Timothy M. Ryan, Dania Beach, FL, presenting comments on State House Redistricting Plan.
Thomasina H. Williams of the Law Offices of Williams & Associates, Miami, FL; Norman C. Powell and Christopher D. Brown of Bilzin, Sumberg, Dunn, Baena, Price & Axelrod, LLP, Miami, FL; and Ronald A. Klain and Jeremy B. Bash of O'Melveny & Myers, LLP, Washington, DC, on behalf of Honorable Raul Martinez, Bishop Victor T. Curry, and Southwest Voter Registration Education Project.
Charles T. Canady, General Counsel, and Carlos G. Muniz, Deputy General Counsel, Tallahassee, FL on behalf of Jeb Bush, Governor of the State of Florida.
Comments of the Honorable T.K. Wetherell, Lamont, FL, the Honorable Ralph Haben, Tallahassee, FL, and the Honorable John E. Thrasher, Orange Park, FL, Former Speakers of the Florida House of Representatives.
Audrey E. Vance, City Attorney, Bonita Springs, FL, on behalf of the City of Bonita Springs, Lee County, FL, and Paul Pass, Wayne Edsall, Jay G. Arend, Robert Wagner, John Warfield, David Piper and Ben Nelson, individually and as members of the Bonita Springs City Council.
Mark C. Curenton, Assistant County Planner, Apalachicola, FL, presenting Resolution by the Franklin County Board of County Commissioners.
Theodore C. Taub, Jaime Austrich, and Kimberly A. Benner of Shumaker, Loop & Kendrick, LLP, Tampa, FL, on behalf of the City of Temple Terrace, FL.
Comment of John W. Beebe, Boca Raton, FL.
Anita Gregory, Executive Director, Apalachicola, FL, on behalf of Apalachicola Bay Chamber of Commerce.
Comment of Kevin P. Tynan of Bowman, Richardson & Tynan, P.L.C., Tamarac, FL.
Comment of Eric Garner, Pembroke Pines, FL.
Comment of Cheryl Krause, Pembroke Pines, FL.
Comment of Harris Klein and Shirley Klein, Pembroke Pines, FL.
Comment of Robert Nagle, Pembroke Pines, FL.
Comment of Representative Dwight Stansel, Live Oak, FL.
M. Blair Payne of Darby, Peele, Bowdon, Payne & Kennon, Lake City, FL, presenting comments of Interested Parties Who Are Residents of District 11, Florida House of Representatives.
Comment of Thomas F. Visconti, Ormond Beach, FL.
George C. Mohlke, Jr., Chair, Naples, FL, presenting Comment of Democratic Executive Committee of Collier County.
Representative Dan Saul Gelber, Coral Gables, FL, presenting comments on behalf *823 of Richard L. Steinberg, Simon Cruz, Bruce M. Singer, Saul Gross, Linda Charlene Barnett, Ronald G. Stone, Brian Smith, Jose Smith, Lenore Fleming, Gerald K. and Debra H. Schwartz, Terri Echarte, Guillermo Echarte, David M. Dobin, Mike Gibaldi, Susan Fleming, Leslie Coller, Kathryn Blakeman, Sally Sims Barnett, Wendy S. Unger, Polita Glynn, George Mallinckrodt, Gail L. Harris, Susan Hart, Kathryn Herman, Stuart and June Jacobs, Laura Jamieson, John Koenig, Barbara Levine, Marion Levien, Mathilde Maubach, Tod Narson, Mary Grace Russo, Karen Rivo, Marilyn Spiegel, and Alisa Pardo Stein.
Comment of Mark Moore, Yankeetown, FL.
Comment of Denise Kuhn, Tampa, FL.
Comment of Joanne Florin, Seminole, FL.
Comment of Mayor Lane Gilchrist, City of Gulf Breeze, FL.
Comment of Mayor Roland F. Hotard, III, City of Winter Park, FL.
Comment of Andrew Porter, Lake City, FL.
Mayor Thomas M. Wenham, presenting comment of the Village of Wellington, Wellington, FL.
Comment of Fred Peacock, Pierson, FL.
Comment of Dee Staats, Clearwater, FL.
Comment of Tim Pauls, District 5 Commissioner, Walton County, Santa Rosa Beach, FL.
Comment of Mayor J.J. Beyrouti, Town of Redington Shores, FL.
Stephen Sherbin, Chairman of Board of Directors, Palm Bay, FL, presenting comment of Greater Palm Bay Chamber.
Comment of Thomas Vourlos, Belleair, FL.
Comment of Malcolm E. McLouth, Executive Director, Canaveral Port Authority, Cape Canaveral, FL.
Comment of Roger Austin, Gainesville, FL.
Comment of David Miller, Gainesville, FL.
Comment of Arthur Cullen, Panama City, FL.
Comment of Marlene Clausen, Indian Shores, FL.
Comment of Brad Levine, Delray Beach, FL.
Comment of David L. Henninger, Delray Beach, FL.
Councilman John Mazziotti, Councilman Tres Holton, and Deputy Mayor Pat Woodard, Palm Bay, FL, presenting comments of the City of Palm Bay.
Harry J. Mertz, City Manager, and Andrew S. Maurodis, Attorney for City of Parkland, presenting comments for the City Commission of the City of Parkland.
Comment of Jeffery A. Boone, Venice, FL.
Comment of James Coletta, Chairman, Collier County Board of Commissioners, Naples, FL.
Comment of Sendur Keskin, Apopka, FL.
Comment of Paul G. Faircloth, Jr., Apopka, FL.
Comment of William Lovelady, Zellwood, FL.
Comment of Mayor Lloyd A. Green, City of Keystone Heights, FL.
Comment of Ed Gray, III, Gulf Breeze, FL.
Comment of G. Paul Clark, Ocala, FL.
*824 HARDING, J.
This is an original proceeding in which the Attorney General petitions this Court for a declaratory judgment determining the validity of House Joint Resolution 1987 apportioning the Legislature of the State of Florida. We have jurisdiction under article III, section 16(c) of the Florida Constitution, which provides:
JUDICIAL REVIEW OF APPORTIONMENT. Within fifteen days after the passage of the joint resolution of apportionment, the attorney general shall petition the supreme court of the state for a declaratory judgment determining the validity of the apportionment. The supreme court, in accordance with its rules, shall permit adversary interests to present their views and, within thirty days from the filing of the petition, shall enter its judgment.
On March 22, 2002, the Legislature passed House Joint Resolution 1987, which apportions the Florida Senate and House of Representatives based on the population figures established in the 2000 census. The Attorney General filed this declaratory judgment petition on April 8, 2002, and this Court invited all those interested to submit briefs and comments in support of or opposition to the plan and to participate in oral argument before the Court.
We begin our analysis by addressing the scope of this Court's review in the instant proceeding. Our review afforded under article III, section 16(c) is extremely limited. In our first opinion examining the jurisdictional basis of article III, section 16(c), Florida Constitution, after its adoption, we observed:
At the outset, we emphasize that legislative reapportionment is primarily a matter for legislative consideration and determination. Judicial relief becomes appropriate only when a legislature fails to reapportion according to federal and state constitutional requisites. If these requisites are met, we must refrain, at this time, from injecting our personal views into the proposed reapportionment plan. Even though we may disagree with the legislative policy in certain areas, the fundamental doctrine of separation of powers and the constitutional provisions relating to reapportionment require that we act with judicial restraint so as not to usurp the primary responsibility for reapportionment, which rests with the Legislature.
In re Apportionment Law Senate Joint Resolution 1305, 1972 Regular Session, 263 So.2d 797, 799-800 (Fla.1972). We explained that in this review we would only pass upon the facial validity of the plan and not upon any as-applied challenges. See id. at 808. The claims we could review included adherence to the one-person, one-vote constitutional requirement, see id. at 802, and the state constitutional requirement that the districts contain contiguous, overlapping, or identical territory. See id. at 805-7. We made clear that we are without authority to declare a legislative apportionment plan invalid unless it violated some prohibition in the constitution. See id. at 805. Importantly, we noted that the requirements under the Florida Constitution are not more stringent than the requirements under the United States Constitution. See id. at 807-8. We adhered to the limited nature of our facial review in the 1982 case, see In re Apportionment Law Appearing as Senate Joint Resolution 1 E, 1982 Special Apportionment Session, 414 So.2d 1040 (Fla.1982),[1] *825 and again in the 1992 case. See In re Constitutionality of Senate Joint Resolution 2G, Special Apportionment Session 1992, 597 So.2d 276 (Fla.1992).
We are aware that in 1992, we performed a quasi-Voting Rights Act review. See id. at 282. Subsequent to that decision, however, the Supreme Court has continuously recognized that Section 2 Voting Rights Act claims are generally fact-based claims. As discussed below, the confines of article III, section 16(c), adopted as part of the 1968 revision to Florida's Constitution, do not allow for a fact-intensive review within our thirty-day window.
Also in contention in various comments and at oral argument is the presumptive validity of the joint resolution of apportionment and the amount of deference this Court gives to the joint resolution of apportionment. The opponents generally argue that the Legislature's joint resolution of apportionment is not presumptively valid like a statute because the joint resolution is not subject to gubernatorial veto. Our 1972 opinion addressed this issue. See In re Apportionment Law, 263 So.2d at 805-6. To clarify this issue, consistent with the discussion in the 1972 case, we hold that the joint resolution of apportionment identified in article III, section 16, Florida Constitution, upon passage is presumptively valid.[2] Unless it can be shown that the joint resolution of apportionment facially violates some provision of the United States Constitution or the Florida Constitution, this Court may not declare the joint resolution invalid. See id. at 805.
Turning to the merits of our review, we first address the constitutional validity of the plan under the equal protection standard of one-person, one-vote. See In re Senate Joint Resolution 2G, 597 So.2d at 278. This Court has held that the Equal Protection Clause "requires that state legislatures be apportioned in such a way that each person's vote carries the same weightthat is, that each legislator represents the same number of voters." Id. (citing Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). We make this determination by analyzing the population figures in each district.
House Joint Resolution 1987 apportions the state into 120 House districts and 40 Senate districts.[3] Florida's population is 15,982,378.[4] Therefore, the ideal population per single-member House district is 133,186. The most populous House district is District 98, with a total population of 135,043deviating from the ideal population by 1,857 persons, or 1.39%. The least populous House district is District 32, with a total population of 131,310deviating from the ideal population by 1,876 persons, or 1.4%. Therefore, the maximum percentage deviation between the largest and smallest number of people per representative (statistical overall range) is 2.79%.
*826 The ideal population per single-member Senate district is 399,559. The most populous Senate district is District 39, with a total population of 399,606deviating from the ideal population by 47 persons, or.01%. The least populous Senate district is District 40, with a total population of 399,488 deviating from the ideal population by 71 persons, or 0.02%. Therefore, the maximum percentage deviation between the largest and smallest number of people per representative (statistical overall range) is 0.03%.
Even though the districts do not comply precisely with the ideal population per district, we have recognized that "mathematical exactness is not a requirement in state apportionment plans." In re Senate Joint Resolution 2G, 597 So.2d at 279 (citing Reynolds, 377 U.S. at 577, 84 S.Ct. 1362). "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts... as nearly of equal population as is practicable." Id. (quoting Reynolds, 377 U.S. at 577, 84 S.Ct. 1362). In White v. Regester, 412 U.S. 755, 764, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court held that "minor population deviations among state legislative districts [do not] substantially dilute the weight of individual votes in larger districts so as to deprive individuals in these districts of fair and effective representation." The Supreme Court subsequently held "as a general matter ... an apportionment plan with a maximum population deviation under 10% falls within [the] category of minor deviations." Voinovich v. Quilter, 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (quoting Brown v. Thomson, 462 U.S. 835, 842-43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983)); see also Connor v. Finch, 431 U.S. 407, 418, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).[5]
Common Cause Florida and the Florida League of Women Voters argue that the advances in technology, namely the advent of the computer-based Florida Redistricting System (FREDS) used to develop the reapportionment plan, affords the Legislature the opportunity to design districts each in exactly the same numerical size.[6] This notion, however, overlooks the fact that the Supreme Court has made it clear that the goal of achieving population equality among districts is not paramount:
We have recognized that some deviations from population equality may be *827 necessary to permit States to pursue other legitimate objectives such as "maintain[ing] the integrity of various political subdivisions" and "provid[ing] for compact districts of contiguous territory." As the Court stated in Gaffney [v. Cummings, 412 U.S. 735, 749, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)], "a[n] unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement."
Brown v. Thomson, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (citation omitted) (some alterations in original).[7] Moreover, as the Supreme Court stated, "[a]ny standard, including absolute [numerical] equality, involves a certain artificiality.... [E]ven the census data are not perfect, and the well-known restlessness of the American people means that population counts for particular localities are outdated long before they are completed." Karcher v. Daggett, 462 U.S. 725, 732, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).
Given that the statistical overall ranges for the House and Senate districts, 2.79% and 0.03% respectively, each fall well under the 10% deviation that the Supreme Court and this Court have recognized as constitutionally valid, we find that the Legislature has achieved a mathematical preciseness in the districts that complies with the equal protection requirements of both the Florida and United States Constitutions. See Regester, 412 U.S. at 755, 93 S.Ct. 2332 (upholding constitutionality of Texas state reapportionment despite total deviation between largest and smallest districts of 9.9%); Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (holding that numerical deviations from population equality in a Connecticut legislative apportionment plan failed to make out a prima facie violation of the equal protection clause where maximum population deviations for the House and Senate were 7.83% and 1.81%, respectively).[8] Even if the advent of computer-based redistricting software has lowered the maximum permissible deviation, we conclude that the relatively minor deviation before us in this case does not lead to the conclusion that either the House or Senate plans are facially in violation of the one-person, one-vote requirement.
The next issue for our resolution is the constitutional requirement that the legislative districts be "either contiguous, overlapping or identical territory." Art. III, § 16(a), Fla. Const. In In re Senate Joint Resolution 2G, we explained:
This Court has defined "contiguous" as "`being in actual contact: touching along a boundary or at a point.'" In re Apportionment Law, Senate Joint Resolution 1 E, 414 So.2d 1040, 1051 (Fla. 1982) (quoting Webster's New Collegiate Dictionary 245 (1973)). A district lacks contiguity "when a part is isolated from the rest by the territory of another district" or when the lands "mutually touch only at a common corner or right angle." Id.

. . . .

*828 Although a contiguous district has been defined as one in which a person can go from any point within the district to any other point without leaving the district, such definition does not impose a requirement of a paved, dry road connecting all parts of a district. Contiguity does not require convenience and ease of travel, or travel by terrestrial rather than marine forms of transportation....
... [T]he presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district, does not violate this Court's standard for determining contiguity under the Florida Constitution.
597 So.2d at 279-80. Additionally, there is no requirement that district lines follow precinct or county lines. See In re Apportionment Law, 263 So.2d at 801.
The Attorney General concedes that the proposed districts satisfy the geographic requirements of the Florida Constitution. In contrast, Common Cause Florida and the Florida League of Women Voters assert that newly created Senate District 19 is not contiguous. Our review of Senate District 19, however, reveals that the district conforms with the state constitutional contiguity requirement. Lee County argues that Senate District 27, which connects a population center in Lee County with a population center in Palm Beach County, is not contiguous because it crosses the waters of Lake Okeechobee without connecting territory on either the lake's northern or southern shores. While establishing a district across a body of water as large as Lake Okeechobee stretches to the limits our language that a district drawn across a body of water does not violate the contiguity requirement, see In re Senate Joint Resolution 2G, 597 So.2d at 280, we conclude that Senate District 27 is permissible under the state constitutional contiguity requirement. We have reviewed the remaining Senate and House districts and find that they also satisfy this constitutional requirement.
Next, several parties allege that House Joint Resolution 1987 discriminates against racial or language minorities. In making these claims, the parties rely on both the Equal Protection Clause[9] and Section 2 of the Voting Rights Act.[10] In *829 previous redistricting opinions, we have attempted to address such claims. See In re Senate Joint Resolution 2G, 597 So.2d at 280-85;[11]In re Senate Joint Resolution 1 E, 414 So.2d at 1051-52. In fact, in 1992, we specifically rejected the argument that "[g]iven the complex evidentiary standard imposed on those who challenge a redistricting plan under the Voting Rights Act, ... this Court cannot possibly consider such a claim at this time." In re Senate Joint Resolution 2G, 597 So.2d at 281-82.[12] However, with the advancement of redistricting technology, the continued development of case law in this area, and the unique fact-intensive circumstances presented in the instant case, we determine that we are not in a position to properly address such issues in the present proceeding, especially in light of the constitutional time limitations placed on the Court. See art. III, § 16(c), Fla. Const.[13] Such claims are better suited for a court of competent jurisdiction where there is an opportunity to present evidence and witness testimony and where the court has the ability to make factual findings based on the evidence presented.[14] Therefore, we decline to rule on these claims in this proceeding.
Several parties raise claims that House Joint Resolution 1987 constitutes *830 partisan gerrymandering. The Supreme Court has recognized that political gerrymandering claims are justiciable under the Equal Protection Clause. See Davis v. Bandemer, 478 U.S. 109, 118-27, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). While a majority of the Supreme Court did not agree as to the standards that would govern such a claim, a plurality of the Court concurred in Part III of the Bandemer opinion, which set forth the standard for assessing a claim of political gerrymandering. See id. at 127-143, 106 S.Ct. 2797 (four justices concurring in Part III).[15]
Under the Bandemer test, a plaintiff raising a political gerrymandering claim must establish that there was (1) intentional discrimination against an identifiable political group and (2) an actual discriminatory effect on that group. See id. at 127, 106 S.Ct. 2797. The plurality opinion candidly recognized that the first determination of intentional discrimination against an identifiable political group would not be difficult to show in most instances because "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." Id. at 129, 106 S.Ct. 2797.
In order to establish that there has been an actual discriminatory effect, the plaintiff must show that: (1) the identifiable group has been, or is projected to be, disadvantaged at the polls; and (2) by being disadvantaged at the polls, the identifiable group will lack political power and be denied fair representation. See id. at 139, 106 S.Ct. 2797. As the Bandemer plurality explained, "the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." Id. at 131, 106 S.Ct. 2797. This conclusion is premised on the assumption that "the power to influence the political process is not limited to winning elections" because the elected candidate will still be responsive to the voters in his or her district. Id. at 132, 106 S.Ct. 2797. "[W]ithout specific supporting evidence, a court cannot presume... that those who are elected will disregard the disproportionately underrepresented group." Id. The discriminatory effect of political gerrymandering would only be found "when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." Id. As the plurality opinion explained, the plaintiff must establish that the discriminated against group has "essentially been shut out of the political process." Id. at 139, 106 S.Ct. 2797.[16]
*831 In order to mount a successful political gerrymandering claim against House Joint Resolution 1987, a plaintiff would have to establish a factual basis for the claim of actual discriminatory effect. Similar to our discussion of the Voting Rights Act above, this claim is "better suited for a court of competent jurisdiction where there is an opportunity to present evidence and witness testimony and where the court has the ability to make factual findings based on the evidence presented." Supra at p. 829. Further, the Legislature and other proponents of the redistricting plan must be afforded an opportunity to respond to any evidence of discriminatory effect. The present proceeding before this Court is not the proper forum to address such a fact-intensive claim.
Several parties also claim that House Joint Resolution 1987 should be declared invalid because the Legislature ignored traditional principles of redistricting such as compactness and preservation of communities of interest. However, neither the United States nor the Florida Constitution requires that the Florida Legislature apportion legislative districts in a compact manner or that the Legislature preserve communities of interest. See, e.g., Shaw v. Reno, 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("[T]raditional districting principles such as compactness ... and respect for political subdivisions ... are important not because they are constitutionally required they are not ...."); art. III, § 16(a), Fla. Const. Therefore, we find no merit to this claim.
Mayor Raul Martinez, Bishop Victor T. Curry, and the Southwest Voter Registration and Education Project argue that the newly created Senate districts are invalid because the Legislature changed the numbering of the newly created Senate districts from the existing Senate districts in order to circumvent the constitutional legislative term limit provisions. See art. VI, § 4(b)(1)-(2), Fla. Const. We conclude that the theoretical possibility that some current senators may be able to serve ten years in the Florida Senate is not a sufficiently important dependent matter arising under article III, section 16, Florida Constitution, that we should address it at this time. See In re Senate Joint Resolution 1 E, 414 So.2d at 1045.
Finally, several parties have questioned the Legislature's decision not to articulate objective standards that guided its redistricting process. In fact, the Attorney General, Marion County, and other individuals who have filed comments have requested this Court to invalidate House Joint Resolution 1987 and return it to the Legislature to allow the Legislature to determine objective standards that would then guide its subsequent reapportionment.[17] Common Cause Florida and the Florida League of Women Voters have *832 offered four objective standards for the Legislature to adopt: all districts should (1) have equal population as closely as possible; (2) be drawn to be compact and contiguous and respect local political boundaries; (3) not dilute the voting strength of any racial, ethnic, or minority group; and (4) be drawn neutrally without regard to the incumbent or political party.
The only standards that the Legislature is constitutionally required to follow in redistricting are the equal protection standard of "one-person, one-vote," the Florida Constitutional requirement that legislative districts be "either contiguous, overlapping, or identical territory," and the requirement not to discriminate against any racial or language minority or political group. See Bandemer, 478 U.S. at 118-27, 106 S.Ct. 2797; In re Senate Joint Resolution 2G, 597 So.2d at 278-80. While the other "standards" advocated by the opponents have been traditional considerations in the redistricting process, they are not constitutionally required. See Shaw v. Reno, 509 U.S. at 647, 113 S.Ct. 2816; Gaffney v. Cummings, 412 U.S. at 752 n. 18, 93 S.Ct. 2321. Hence, we decline the Attorney General's and other parties' requests to return the plan to the Legislature to create standards. As explained above, for those standards that can be fully addressed in this opinion, we conclude that the Legislature has complied with the requirements set forth by the federal and state constitutions.
Accordingly, we conclude that House Joint Resolution 1987 is valid and hereby approve it as the 2002 apportionment of the Florida Legislature. We acknowledge that any interested person should have the opportunity to attempt to raise a race-based equal protection claim, a Section 2 claim, or a political gerrymandering claim in a court of competent jurisdiction. Therefore, our holding is without prejudice to the right of any protestor to file an as-applied challenge to the validity of the plan for these reasons. Should such an as-applied challenge be filed, issues of standing should be resolved by that court, and our opinion should not be read as conferring standing upon any party involved in this case. No motion for rehearing will be entertained.
It is so ordered.
WELLS, C.J., and SHAW, ANSTEAD, and LEWIS, JJ., and VAN NORTWICK, Associate Justice, concur.
LEWIS, J., concurs with an opinion, in which SHAW and ANSTEAD, JJ., and VAN NORTWICK, Associate Justice, concur.
PARIENTE, J., recused.
QUINCE, J., not participating.
LEWIS, J., concurring.
While I concur with the majority opinion in all respects, based upon the comments, petitions, and responses filed here, I believe it necessary to elaborate upon two issues that may call for further discussion. I write separately to further explore the scope of this Court's review in this action, and to specifically address concerns with regard to the constitutional contiguity requirement as it may apply here, especially to districts such as Senate district 27.
In considering the extreme structural time limitation imposed, I must initially note that searching the archives for meaningful historical information to assist the analysis has been most troublesome. Although some information is available, there are certainly substantial issues concerning the quality and content of that which has been preserved to assist the deliberations of this institution as it fulfills its constitutional responsibilities. After reviewing all available historical material in the limited *833 time period afforded by the structural components of the process outlined in the constitution, see art. III, § 16(c), Fla. Const. (allowing this Court thirty days from the filing of the Attorney General's petition to enter judgment), it is clear that many well-intentioned Floridians simply perceive the extent of this Court's responsibility and authority quite differently. This is also reflected in the earliest redistricting decision of this Court in 1972, which was resolved only by a four justice majority with three dissenting opinions. See In re Apportionment Law Appearing as Senate Joint Resolution 1305, 263 So.2d 797 (Fla.1972). The concerns voiced here, with regard to the various issues advanced, have been well and intellectually articulated by both proponents and opponents of the proposed plan. The course which Florida has followed, however, has steadfastly followed the constitutional structural time limitations even as the scope and nature of redistricting challenges have expanded in depth and complexity.
First, a review of the historical context surrounding the drafting and eventual adoption of the reapportionment provisions contained in the 1968 Constitution reveals important principles that do much to explain and guide the scope of the Court's review in this action. The historical basis was only very briefly discussed by this Court in 1982. See generally In re Apportionment Law Appearing as Senate Joint Resolution 1E, 414 So.2d 1040 (Fla.1982). In 1962, the Florida Legislature's apportionment plan was challenged in federal court based upon charges of severe inequities in representative proportionality. Thereafter, on June 22, 1964, the United States Supreme Court reversed the judgment of a three-judge federal district court panel upholding the redistricting template, and directed the district court to reconsider the case in light of the Court's opinion in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). See Swann v. Adams, 378 U.S. 553, 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (1964). The Florida Legislature subsequently reapportioned the state's legislative districts. When this plan was also challenged in federal district court, the court held that the new plan failed to meet the requirements of the Fourteenth Amendment to the U.S. Constitution, but, notwithstanding such infirmity, approved the plan on an interim basis. On appeal, however, the United States Supreme Court reversed, finding no basis for "perpetuating what all concede to be an unconstitutional apportionment for another three years." Swann v. Adams, 383 U.S. 210, 211-12, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966).
In 1966, the Legislature adopted still another reapportionment plan, which was, again, promptly attacked in the federal district court. The United States Supreme Court also invalidated this plan, reasoning that it unconstitutionally contained population deviations in excess of thirty percent among senate districts and forty percent among house districts, and observing that the Legislature had not offered any justification for the deviations. See Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). On remand, the district court finally assumed full responsibility for the process, and proceeded to redistrict Florida itself. See Swann v. Adams, 263 F.Supp. 225, 226-28 (S.D.Fla.1967).
Concurrent with this highly publicized litigation, Florida's statutory Constitution Revision Commission undertook the task of significantly rewriting our state's constitution. A comprehensive study of the available correspondence, reports of hearings, and records of proceedings of both the commission and the Legislature reveals the motivations and goals of these bodies in crafting what is today article III, *834 section 16, and somewhat explains the structural time limitations. First, it is absolutely clear that the commission was attempting to remove litigation regarding proportional representation from the federal courts system. As stated by commission member and a principal drafter John E. Mathews, Jr., in response to questions by Robert M. Ervin, another member of the commission:
MR. ERVIN: Do you feel that that handiwork of yours will solve the problem of actual accomplishment of apportionment in the State of Florida?
MR. MATHEWS: Not being a prophet or son of a prophet, all I can do is have faith and hope that it will. I hope that we get to the situation where we never have to go to court ordered apportionment again. I don't know. But if we continue, then I want our own state court to do it, rather than a federal district court.
. . . .
MR. ERVIN: Let me ask you why you offered the plan ...?
. . . .
MR. MATHEWS: So that if we get into the mess of having to have judicial apportionment, that those of us who believe so firmly in states' rights will have the opportunity to have your state court take the first crack at it.
Constitution Revision Commission, Convention Proceedings 483-85 (Nov. 28, 1966-Jan. 7, 1967) (available at Fla. Dep't of State, Bureau of Archives & Records Management, Fla. State Archives, series 722, carton 3, Tallahassee, Fla.). Obviously, a primary impetus for the enactment of that which became article III, section 16 of the Florida Constitution was the desire to remove the bulk of redistricting litigation from the federal courts and place it directly in the state court system.
The second historical aspect surrounding the enactment of the 1968 Constitution reflected in the limited available material relates to the drafters' views of the scope of this Court's review in actions such as that before us today. My examination of the commission's archival documents reveals that the only matter beyond the consecutive numbering and territorial requirements enunciated in section 16(a) of article III that the drafters truly anticipated and structured the organic parameters for this Court to resolve in its review was the one person, one vote principle required by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The foundation of a structure sufficient to explore the depth and complexity of the issues implicated today simply was not discussed or designed into the ultimate constitutional provision which now mandates such a severe structural time limitation for a determination by this institution.
This is only logical, because, as discussed above, the 1968 Constitution was drafted in the era in which three successive reapportionment plans had been invalidated by federal courts on equal protection grounds. The majority of the debates regarding article III, section 16, before the commission and Legislature were centered upon how to structurally address the constitutionally mandated apportionment of legislators among explosively growing metropolitan areas. It is clear, therefore, that the drafters may not have fully anticipated, nor did they have fully presented essential information necessary to predict, that challenges to legislative redistricting plans would allege wrongs of such depth and complexity as to present a breadth of landscape far beyond the prior confrontations which were somewhat limited in scope with regard to proportional representation, as we see it today.
*835 When discussing this Court's role in the redistricting process at a July 1966 public hearing, Chesterfield Smith, the chairman of the 1968 Constitution Revision Commission, made the following statement:
I have become convinced ... that there should be no formula except that the only formula there should be a very general one, of one man, one vote.
The Supreme Court of the United States has, I think, properly refused to delineate the boundaries, and yet we have found the solutions, and this is what this does and it puts it over into the [Florida] Supreme Court to review, as you suggest, if the Legislature doesn't do it. ...
Finally, if the review doesn't accomplish what it is supposed to do, it is put in the outside agency which again happens to be the Supreme Court to actually do it, but within the equal protection of the law formula, if not otherwise, I feel that when you start pouring down formulas into the concrete ... we may be drifting away from these broad general principles which you and I believe are so important in most areas and getting too specific, if we get into formulas beyond the sole words "equal protection of the law," which the U.S. Supreme Court says means one man and one vote.
Constitution Revision Commission, Public Hearings 563-64 (July 15, 1966) (available at Fla. State Archives, series 721, carton 1, Tallahassee, Fla.). Similarly, Representative John Ware made the following request at a public hearing on the revisions: "I urge you to make the Constitution flexible enough so that we ... don't require any specific form of apportionment other than equal representation for all of the people." Constitution Revision Commission, Legislative Committee 664 (July 15, 1966) (available at Fla. Dep't of State, Bureau of Archives & Records Management, Fla. State Archives, series 721, carton 1, Tallahassee, Fla.). Finally, during the commission's deliberations regarding article III, John E. Mathews, Jr., and S.J. Davis, Jr., had the following exchange:
MR. DAVIS: Senator Mathews, isn't it true under the present draft regarding the apportionment problem that the question of districting is left entirely to the discretion of the Legislature?
MR. MATHEWS: No, sir. It is left to the discretion of the Legislature subject to the judgment of the Supreme Court of Florida, first, and the overriding opinion of the Supreme Court of the United States as to whether you have to have districting in order to accomplish equitable apportionment.
Constitution Revision Commission, Convention Proceedings 480-81. Clearly, these comments reveal the thoughts of those who actually performed the drafting of our state's organic law. It may be observed that the drafters designed the structural time limitation to have this Court's review encompass the direct equal protection principle of one person, one vote, without an expansive, complex, and fact-driven proceeding, along with consideration of the explicit constitutional requirements of district territorial shape and numbering.
Clearly, the structure for redistricting plan review contained in article III, section 16 of the Florida Constitution is a direct consequence of the drafters' prior litigation experience and expectations regarding the nature of probable challenges to redistricting plans in the future. Because this Court was expected to review the more limited type of one person, one vote, territorial shape, and numbering issues, a judgment could reasonably be expected "within thirty days from the filing of the [Attorney General's] petition." Art. III, § 16(c), Fla. Const. Based upon the knowledge and *836 expectations of the drafters, there would be no need for this Court to engage in the acceptance and adversarial testing of evidence, fact finding, or any other significant factual examinations of reapportionment plans.
In truth, this Court is not designed, nor is it structured, to engage in these types of activities. This Court would first examine the numbering and shapes of districts. Then, in accordance with federal law mandating proportional representation, we would review any asserted disparities between legislative districts, and render a judgment as to the plan's facial validity. These are the underlying principles which have consistently directed the redistricting decisions of this Court in the past in 1972, 1982, and 1992. See generally In re Apportionment Law Appearing as Senate Joint Resolution 1305, 263 So.2d 797 (Fla. 1972); In re Apportionment Law Appearing as Senate Joint Resolution 1E, 414 So.2d 1040 (Fla.1982); In re Constitutionality of Senate Joint Resolution 2G, 597 So.2d 276 (Fla.1992).
The issue today, therefore, is how this Court should address the collision of the framework of limited review enacted by the drafters of the 1968 Constitution, and the factual depth and complexity of the challenges brought by the opponents of the 2002 reapportionment plan. Certainly, the opponents' claims are based upon allegations of extraordinarily involved, fact-specific wrongs effected by the Legislature in drawing the proposed legislative districts. To be sure, advancing technology has also driven the process. This Court, however, is constrained by the limitations and parameters of article III, section 16(c). Due to the time restrictions and structural limitations imposed by the Florida Constitution, and absent clear error, we have been afforded neither the constitutional time nor constitutional structure to engage in the type of fact-intensive, intricate proceedings required to adjudicate the vast majority of the claims presented by the opponents here or the responses of the legislative bodies. The parameters of our review simply do not allow us to competently test the depth and complexity of the factual assertions presented by the opponents.
In accordance with the expectations of the constitutional drafters, our review of apportionment plans requires that we discuss and apply the decisions of courts passing on the validity of legislative districting plans to the legislative map presently before us. However, as was also intended by the Commission, and as expressed in the prior redistricting decisions of this Court, we are limited in performing our review of the plan for error or discrimination, and we have not been afforded a structure to competently address claims that cannot be determined from the plan itself.
Thus, while some of the claims presented by the parties opposing the Legislature's redistricting resolution may or may not contain meritorious constitutional challenges, this Court's article III, section 16 review is simply not the correct forum for the initial determination of these disputes. Because the claims assert possible cognizable constitutional error, the opponents to the 2002 redistricting plan may address the allegations and responses in a trial court of competent jurisdiction which can properly receive testimony, accept evidence, and render a judgment based upon the entirety of the facts. Surely, the structural limitations which produce this Court's inability to thoroughly address the opponents' constitutional claims and the responses thereto should not be taken as the expression of an opinion as to the relative merit of the asserted constitutional claims or responses presented by the parties *837 to this action. On the contrary, we are unable to address these allegations prior to the proper fact finding and adversarial testing required in any legitimate cause of action. Therefore, I concur in the majority's conclusion that this Court must decline to address the majority of the opponents' equal protection and Voting Rights Act claims at this time.
The second important issue that bears further examination is the question of the contiguity of several districts, particularly with regard to Senate district 27. As illuminated by the parties to this action, proposed Senate district 27 is strikingly odd-shaped, stretching across almost the entirety of the southern peninsula of Florida. When the terrestrial portions of the district are closely studied, it is clear that the district is, in actuality, composed of four distinct fragments of landthe most western section, two separate sections of land that protrude into the southernmost part of Lake Okeechobee, and the eastern section which runs from the shores of Lake Okeechobee nearly to the Atlantic Ocean in Palm Beach Countyaccompanied by an extremely thin, uninhabited thread of land which is located along the southern coastline of the lake. Central to this Court's examination of this district's contiguity is the fact that, in reality, the only geographic feature connecting the four pieces of district 27 is Lake Okeechobee itself.
This Court addressed the parameters of the Florida Constitution's contiguity requirement in In re Constitutionality of Senate Joint Resolution 2G, 597 So.2d 276 (Fla.1992). In that case, when faced with the assertion by opponents of the 1992 apportionment plan that the impossibility of travel through certain districts without crossing into other districts invalidated the plan, this Court held:
Although a contiguous district has been defined as one in which a person can go from any point within the district to any other point without leaving the district, such a definition does not impose a requirement of a paved, dry road connecting all parts of a district. Contiguity does not require convenience and ease of travel, or travel by terrestrial rather than marine forms of transportation....
We hold, therefore, that the presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district, does not violate this Court's standard for determining contiguity under the Florida Constitution.
Id. at 279-80. My consideration of our 1992 opinion, however, leads me to conclude that despite the extraordinarily permissive nature of this language, this Court did not intend to authorize the use of bodies of water as bridges between separate and distinct portions of a legislative district, nor as a tool to link disparate and distant population centers. The 1992 decision of this Court is far more expansive than necessary to accommodate geographical conditions.
The 1992 reapportionment opinion specifically states that it was addressing the issue of the impossibility of travel within a district as a result of "the presence of bodies of water [within the district] without connecting bridges." Id. at 279. The 1992 decision should have only addressed the validity of specific districts that were bisected or otherwise sliced into portions by bodies of water which could not be traversed by foot or automobile. The decision certainly did not address the situation before us in the instant case, but its expansive language can be applied. For example, here, the Legislature has drawn district 27 in a manner which purposefully *838 seems to use Lake Okeechobee to link distinct portions of distant populations. I do not believe that this Court should have so broadly approved the use of water as a method of connecting territory in 1992, and it certainly should not have intended to sanction this approach in an anticipatory fashion. For example, certain islands of the Florida Keys may logically be connected to coastal districts of south Florida, but not to coastal areas further north along the Atlantic coast. In a similar manner, I do not believe that proper concepts of contiguity in the districting analysis contemplate mere uninhabited threads of land being utilized to join distant population centers.
It must be observed, however, that the language of this Court's 1992 redistricting opinion does not prohibit the drawing method which resulted in the current configuration of Senate district 27. Despite my conclusion that this Court's contiguity jurisprudence was never intended to allow the use of a body of water as a tool for linking distant and independent portions of a district, and that it should have been predicated upon concepts of compactness, I am constrained by this Court's statement that "the presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district, does not violate this Court's standard for determining contiguity under the Florida Constitution." Id. at 280. Therefore, I must strongly emphasize the majority's conclusion that district 27 "stretches to the limit" our 1992 holding regarding contiguity, and concur in the majority's approval of proposed Senate district 27.
SHAW and ANSTEAD, JJ., and VAN NORTWICK, Associate Justice, concur.
NOTES
[1] In 1982, we recognized that our review extended to "important dependent matters" which arise under article III, section 16, and where no fact-finding is involved and there is a necessity to avoid multiple litigation. See In re Senate Joint Resolution 1 E, 414 So.2d at 1045. The specific important dependent issue in that case was whether the act of reapportioning the Senate districts truncated to two years the term of those senators elected to a four-year term in 1980. See id. Even though we addressed that issue, we did not expand upon the limited facial review which the Florida Constitution authorizes this Court to perform.
[2] We would be remiss if we did not point out that the presumptive validity of the joint resolution in no way alters the State's obligations under Section 5 of the Voting Rights Act.
[3] All districts in both the House and the Senate are single-member districts.
[4] Population figures are those reported in the United States Decennial Census of 2000, upon which the Legislature based the apportionment plan.
[5] Recently, in reviewing a Pennsylvania congressional reapportionment plan dividing population among nineteen districts, a federal district court found that plaintiffs had pled a prima facie violation of the one-person, one-vote command of Article I, section 2 of the United States Constitution and, therefore, denied defendant's motion to dismiss where the deviation between the ideal and the plan was nineteen people, or less than 0.0001%. See Vieth v. Pennsylvania, 188 F.Supp.2d 532 (M.D.Pa.2002). The Supreme Court, however, has recognized that distinctions can be made between congressional and state legislative representation, and "[s]omewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting." Reynolds, 377 U.S. at 578, 84 S.Ct. 1362. In particular, states normally draw a larger number of legislative districts, which accordingly require a greater margin to account for geographical and political boundaries. See White v. Weiser, 412 U.S. 783, 793, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) ("[C]ongressional districts are not so intertwined and freighted with strictly local interests as are state legislative districts.").
[6] The Legislature designed the FREDS software, which is a sophisticated program that uses the census information to allow the user to draw legislative and congressional districts. The Legislature provided the software to libraries throughout the state and marketed the program to the general public for $20. The program allowed members of the general public to e-mail their own redistricting plans to the Legislature.
[7] In Brown, the Supreme Court upheld a Wyoming apportionment plan even though the result was a deviation averaging 16% from exact population equality. See Brown, 462 U.S. at 838, 103 S.Ct. 2690.
[8] The Attorney General also concedes that "[t]hese deviations are well within the range permissible for state legislative reapportionment." Brief of Attorney General at 20 (citing Brown, 462 U.S. at 842, 103 S.Ct. 2690 and Connor, 431 U.S. at 418, 97 S.Ct. 1828).
[9] The Supreme Court has recognized two "analytically distinct" equal protection claims that may be raised in challenging a state's reapportionment plan. See Miller v. Johnson, 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). In the first type of equal protection claim, it must be alleged that a state has used race as a basis for separating voters into districts. In Shaw v. Hunt, 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), the Supreme Court held that a racially gerrymandered district was permissible only where a governmental body is pursuing a "compelling state interest" and the means chosen to accomplish the State's asserted purpose were specifically and narrowly framed to accomplish that purpose. In the second type of equal protection claim, it must be alleged that a state that has enacted a particular districting scheme as a device "to minimize or cancel out the voting potential of racial or ethnic minorities." City of Mobile v. Bolden, 446 U.S. 55, 66, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). This second type of claim requires a showing of purposeful discrimination. See id. This requirement distinguishes an equal protection claim from a claim under Section 2 of the Voting Rights Act (which does not require a showing of purposeful discrimination). See Page v. Bartels, 144 F.Supp.2d 346, 367 (D.N.J.2001).
[10] Congress enacted the Voting Rights Act of 1965 pursuant to authority granted by the Fifteenth Amendment to the United States Constitution. Section 2 of the Act provides that "[n]o voting qualifications or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973 (1994).
[11] In 1992, we stated the following regarding our review of Section 2 of the Voting Rights Act:

[T]o the extent that we can do so under our own constitution, we believe we are obligated to consider the Voting Rights Act in our evaluation of the validity of the plan. At the same time, it is impossible for us to conduct the complete factual analysis contemplated by the Voting Rights Act, as interpreted in Thornburg v. Gingles, [478 U.S. 30, 106 S.Ct. 2752 (1986),] within the time constraints of article III, section 16(c). However, our analysis will include a consideration of all of the statistical data filed herein, including the breakdown of white, black, and Hispanic voting-age populations and voting registrations in the legislative districts contained in the Joint Resolution and in other proposed plans, none of which are disputed. We shall be guided in our analysis by the law applicable to the Voting Rights Act. Any decision which requires consideration of facts that are unavailable in our analysis will have to be resolved in subsequent litigation.
In re Senate Joint Resolution 2G, 597 So.2d at 282 (footnotes omitted).
[12] Despite this Court's attempt at a limited Section 2 review in 1992, several parties nevertheless filed subsequent Section 2 actions in federal district court, which resulted in a five-day trial. See Johnson v. DeGrandy, 512 U.S. 997, 1002, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). The district court ruled in favor of the plaintiffs, but upon review, the Supreme Court determined that the Florida House plan did not violate Section 2. The Supreme Court also concluded that this Court's "preliminary look" at the Section 2 claim had "no preclusive effect" upon other courts:

[T]he Supreme Court of Florida accepted briefs and evidentiary submissions, but held no trial ... in the court's own words, it was "impossible ... to conduct the complete factual analysis contemplated by the Voting Rights Act ... within the time constraints of article III."
512 U.S. at 1005, 114 S.Ct. 2647.
[13] Simply, article III, section 16(c) did not envision the development of the highly complex federal claims. The juxtaposition of these claims onto this Court's article III, section 16(c) review is highly problematic.
[14] This point is highlighted by the dispute in the present case regarding the appendix to the briefs filed by Raul A. Martinez, Mayor of Hialeah, and others, which allegedly contains an expert witness's report. The Senate and House of Representatives moved to strike this testimony from the record. At oral argument, counsel for the House explained that the proponents of the plan have had no opportunity to challenge the qualifications of the expert or cross-examine the expert.
[15] Because a fragmented Supreme Court decided Bandemer and no single rationale explaining the result garnered the assent of five justices, "`the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Thus, claims of political gerrymandering are to be measured by the standard set forth by the plurality of the Supreme Court in Bandemer.
[16] In applying the Bandemer standard to assess a claim of political gerrymandering, the Pennsylvania Supreme Court observed that "[t]his is unquestionably an onerous standard, difficult for a plaintiff to meet." Erfer v. Commonwealth, No. 14 MM 2002, 794 A.2d 325, 333 (Pa.2002). One federal district court concluded that a party alleging discriminatory effect from political gerrymandering had not been shut out of the political process where the redistricting plan created a number of "safe" districts for that party. See Pope v. Blue, 809 F.Supp. 392, 397 (W.D.N.C.), aff'd, 506 U.S. 801, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992).
[17] The Attorney General and various other parties who have filed comments argue that the Supreme Court's decision in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), should be construed to mean that an absence of specific reapportionment standards articulated by the Legislature beyond the constitutional standards results in arbitrarily drawn districts and a violation of equal protection. The Supreme Court in Bush addressed the issue of whether "the use of standardless manual recounts [in the 2000 presidential election] violate[d] the Equal Protection Clause." Id. at 103, 121 S.Ct. 525. We do not read the Supreme Court's decision in Bush as requiring the Florida Legislature to announce extraconstitutional standards which the Legislature would be required to follow in its reapportionment decisions. We therefore decline the invitation to expand upon the Supreme Court's decision in Bush in this regard.