LEWIS, J.,
concurring.
While I concur with the majority decision, I write separately to address two aspects of this process, the second of which also applies to the entire reapportionment process in general. First, I commend the parties for superb briefing of the issues, as well as the professional demeanor and articulate presentations during oral argument. The quality of legal representation has been exemplary and served to crystallize the issues presented to enable this Court and the parties to engage in a thoughtful and intelligent dialogue.
*687 Second, it must be recognized that the elements and standards that must be utilized in review of legislative plans for reapportionment have been expanded dramatically by the recent adoption of article III, section 21 of the Florida Constitution. Thus, the redistricting process now involves a complex series of elements that this Court must evaluate to determine the validity of reapportionment plans. We have the constitutional obligation to conduct, to the best of our ability, the heightened review contemplated and expressed by the citizens of Florida who voted to add this amendment to our constitution. Further, in this first review under the new constitutional standards, we necessarily must engage in an analysis and application of those new standards in the context of this redistricting. However, despite our duty to review legislative reapportionment plans for constitutional compliance, I write to again reiterate and emphasize that this Court is limited to resolving only facial challenges to such plans.
In my concurrence to the majority decision approving the 2002 legislative reapportionment plans, I presented the historical background of the drafting of the 1968 Florida Constitution. See In re Constitutionality of House Joint Resolution 1987, 817 So.2d 819, 834-36 (Fla.2002) (Lewis, J., concurring). This history revealed the intent of the drafters at that time in two respects with regard to the scope of this Court’s review pursuant to article III, section 16 of the Florida Constitution. First, the Constitutional Revision Commission sought to remove the bulk of litigation with regard to redistricting from the federal court system and to place it within the state court system. See id. (Lewis, J., concurring).[65] Second, and more pertinent to the plan we consider today, this history revealed that beyond the consecutive and territorial requirements enunciated in section 16(a), the drafters envisioned the scope of this Court’s review of legislative reapportionment plans to be limited solely to whether the plans complied with the one person, one vote requirement of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. See House Joint Resolution 1987, 817 So.2d at 834-36 (Lewis, J., concurring). For this reason, the strict time limit of thirty days could be considered facially reasonable for this Court to complete the review required by article III, section 16, as contemplated by the drafters.
In my earlier concurrence, I addressed this structural temporal concern and concluded that the perception of the public with regard to this Court’s ability to review plans of reapportionment conflicted with the time and structural limits placed upon this Court by the Florida Constitution:
Based upon the knowledge and expectations of the drafters, there would be no need for this Court to engage in the acceptance and adversarial testing of evidence, fact finding, or any other significant factual examinations of reapportionment plans.
In truth, this Court is not designed, nor is it structured, to engage in these types of activities....
*688 The issue today, therefore, is how this Court should address the collision of the framework of limited review enacted by the drafters of the 1968 Constitution, and the factual depth and complexity of the challenges brought by the opponents of the 2002 reapportionment plan. Certainly, the opponents’ claims are based upon allegations of extraordinarily involved, fact-specific wrongs effected by the Legislature in drawing the proposed legislative districts. To be sure, advancing technology has also driven the process. This Court, however, is constrained by the limitations and parameters of article III, section 16(c). Due to the time restrictions and structural limitations imposed by the Florida Constitution, and absent clear error, we have been afforded neither the constitutional time nor constitutional structure to engage in the type of fact-intensive, intricate proceedings required to adjudicate the vast majority of the claims presented by the opponents here or the responses of the legislative bodies. The parameters of our review simply do not allow us to competently test the depth and complexity of the factual assertions presented by the opponents.
Id. at 835-36 (Lewis, J., concurring) (emphasis added). Although ten years have elapsed since I first suggested the concerns with regard to fact-intensive challenges to reapportionment plans, nothing has improved and, indeed, with the addition of multiple new constitutional requirements than were mandated ten years before, see art. Ill, § 21, Fla. Const., my concerns are equally, if not more, applicable in 2012.
I authored the opinion that authorized that the amendment that delineated additional standards for legislative redistricting be placed on the 2010 election ballot. See Advisory Op. to Att’y Gen. re Standards For Establishing Legislative Dist. Boundaries, 2 So.3d 175 (Fla.2009) (plurality opinion). This amendment, which has now become article III, section 21 of the Florida Constitution, was intended to rectify the absence of constitutional standards to safeguard against alleged political gerrymandering and to respect geographic boundaries and compactness. Notably, in 2002, this Court rejected an equal protection challenge to a redistricting plan that at that time divided Marion County into four Senate districts. See Florida Senate v. Forman, 826 So.2d 279, 280 (Fla.2002). This Court reversed the circuit court’s determination that the Senate plan constituted an impermissible political gerrymander. In reaching this decision, the Court noted that, unlike other state constitutions, the Florida Constitution contained no provisions requiring that the Legislature draw districts that treat similarly situated communities in a similar matter or give consideration to local boundaries:
The appellees’ actual complaint is that the Senate plan should be declared unconstitutional because the Legislature ignored traditional principles of redistricting such as compactness and preservation of communities of interest.... However, in House Joint Resolution 1987, this Court specifically rejected this type of claim: “[Njeither the United States nor the Florida Constitution requires that the Florida Legislature apportion legislative districts in a compact manner or that the Legislature preserve communities of interest.” 817 So.2d at 831. See also Shaw v. Reno, 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (“ [Traditional districting principles such as compactness ... and respect for political subdivisions ... are important not because they are constitutionally required — they are not.... ”); [In re Apportionment Law Senate Joint Resolution No. 1805, 1972 Regular Ses *689 sion, 263 So.2d 797, 801 (Fla.1972) ] (“[T]here is no requirement that district lines follow precinct or county lines.”).
Id. at 282.
The 2010 amendment reversed those legal principles and incorporated political and geographic boundary and compactness standards, along with others, into the Florida Constitution. See Establishing Legislative Dist. Boundaries, 2 So.3d at 181 (“The overall goal of the proposed amendments is to require the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations.”). By adopting additional redistricting standards to the Florida Constitution, it is clear that the citizens of Florida intended that this Court review legislative apportionment plans for constitutional compliance in greater detail than ever before. See id. at 183 (noting that article III, section 21, “ehange[s] the standard of review to be applied when either the attorney general seeks a ‘declaratory judgment’ with regard to the validity of a legislative apportionment, or a redistricting plan is challenged”).
It was the decision of the citizens of Florida to implement the desired changes to our state constitution through the constitutional initiative process. We must never understate that the Florida Constitution belongs to the people of Florida. Therefore, we as a Court are required to conduct the heightened review envisioned by the citizens of our State when they voted to amend our state constitution. Thus, to the extent possible, we must evaluate the legislative reapportionment plans to determine whether they comply with the standards delineated in article III, section 21, e.g., whether the plans were drawn with the intent to favor or disfavor a political party or an incumbent; whether the plans were drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process; whether the plans diminish the ability of language or racial minorities to elect representatives of their choice; whether the districts in the plans are compact; whether the plans utilize existing political and geographical boundaries where feasible; and whether the districts are as nearly equal in population as is practicable.
At the same time, I emphasize, as I did in 2002, that our current constitutional structure, with the thirty-day time limitation, does not permit this Court to develop, consider, and address all factual challenges to the legislative plans. Challenges that require expert testimony and complex fact-finding are neither workable nor appropriate in this Court. Nothing in article III, section 21, expanded the authority or jurisdiction of this Court to adjudicate as-applied challenges in the redistricting process. Were the opposite true, challenges that may warrant and should receive adversarial testing in a judicial forum would be relegated to hollow legal arguments without substance before this Court. The deadline and structural limitations placed upon this Court would inevitably result in the frustration of an intelligent, purposeful review of any factual challenge to reapportionment plans proposed by the Legislature.
This Court is not structurally equipped to conduct complex and multi-faceted anal-yses with regard to many factual challenges to the 2012 legislative reapportionment plan. As was the case in 2002, we can only conduct a facial review of legislative plans and consider facts properly developed and presented in our record. See House Joint Resolution 1987, 817 So.2d at 824 (emphasizing that the Court would only pass “upon the facial validity of the plan and not upon any as-applied challenges”). In Brown v. Butterworth, 831 *690 So.2d 683 (Fla. 4th DCA 2002), the Fourth District Court of Appeal articulated the distinction between a facial challenge to a reapportionment plan and an as-applied challenge:
First, there is the facial challenge, in which a party seeks to show that, as written, the plan explicitly violates some constitutional principle. Second, there is an as-applied challenge, in which a party seeks to establish that, based on facts existing outside the plan, and as applied to one or more districts, the plan violates the federal or state constitutions, or the Voting Rights Act of 1965(VRA).
Id. at 686 (footnote omitted) (emphasis added). In the context of a challenge to a statute, the First District Court of Appeal explained that, “A facial challenge considers only the text of the statute, not its application to a particular set of circumstances, and the challenger must demonstrate that the statute’s provisions pose a present total and fatal conflict with applicable constitutional standards.” Ogborn v. Zingale, 988 So.2d 56, 59 (Fla. 1st DCA 2008) (emphasis added) (quoting Cashatt v. State, 873 So.2d 430, 434 (Fla. 1st DCA 2004)).
Thus, our proper scope of review encompasses those challenges that may be determined from the reapportionment maps themselves and objective statistical data before us. During these expedited proceedings, modern technology has provided this Court with an abundance of information in a very short period of time. Nevertheless, despite the ease of access to data, the constitutional time limit under which this Court is constitutionally required to operate continues to provide a less than optimum forum to address for the first time extremely complex issues related to whether the reapportionment plans comply facially with the standards articulated in article III, section 21 of the Florida Constitution.
However, because we have been provided sophisticated technology, we are able to recognize patterns — or a lack thereof— when we evaluate the facial validity of the plans before us. We are also able to draw conclusions based upon those observations. The majority decision today reflects that while a variety of different rationales and concepts may be available for application in redistricting, the rationales or concepts actually used must be applied consistently. Applying a particular rationale in one part of Florida, but a completely different rationale in another part of the state, creates legitimate constitutional questions as to the boundaries drawn and the justifications for those boundaries as asserted by the drafters. Where a reapportionment plan adheres consistently to generally acceptable rationales and concepts with regard to the drafting of district boundaries, that plan is less likely to be called into question based upon a facial examination of the maps and objective statistical data.
The dissent contends that the Florida Constitution does not require consistency in the drawing of legislative reapportionment maps, and consistency need not be considered in the redistricting process. However, the dissent overlooks that where there is a marked absence of consistent logic in the drawing of legislative boundaries, the asserted reasons for constitutional deviations become excuses to avoid the standards mandated by our constitution. In this way, a lack of consistency directly contravenes the legitimacy of a plan.
Today’s decision also demonstrates that terms used within the newly adopted constitutional standards need definitional parameters. In Establishing Legislative District Boundaries, we stated the following with regard to the constitutional stan *691 dard that “districts shall, where feasible, utilize existing political and geographical boundaries”:
Although the phrase “political and geographical boundaries” used in the proposed amendments may be technically broader than the “city, county, and geographical boundaries” phrase used in the [ballot] summaries, we conclude that this differing use of terminology could not reasonably mislead voters. The sponsor asserts that the terms “city” and “county” are utilized in the summaries because they are more understandable to the average citizen than the legal concept of “political” boundaries. We agree that most voters clearly understand the concept of a city or county boundary, but may be perplexed to define exactly what a “political boundary” may encompass. See Askew v. Firestone, 421 So.2d 151, 155 (Fla.1982) (noting that voters “must be able to comprehend the sweep of each proposal” (quoting Smathers v. Smith, 338 So.2d 825, 829 (Fla.1976))). The purpose of the standards in section (2) of the proposals is to require legislative and congressional districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped districts — such as one senate district that was challenged in Resolution 1987, 817 So.2d at 824-25 — are avoided. Since the “city” and “county” terminology honors this community-based standard for drawing legislative and congressional boundaries, and further describes the standards in terms that are readily understandable to the average voter, we conclude that the use of different terminology does not render the summaries misleading.
2 So.3d at 187-88 (footnote omitted). The majority decision further clarifies that the term “geographical boundaries” does not encompass every tree, creek, railroad track, or road — no matter how small or obscure. Instead, the boundaries relied upon by legislators to draw district boundaries must be both logical and objectively reasonable.
The dissent asserts that the decision of the majority to reject the Senate reapportionment plan is based upon pure speculation and conjecture. I disagree and find that such political rhetoric does not assist an intelligent analysis and discussion. In the majority decision today, this Court rejects the Senate plan based only upon a facial examination of the reapportionment maps and the objective data provided. Therefore, contrary to the contention of the dissent, the Court has properly exercised judicial restraint in a manner that was both warranted and constitutionally necessary. It is obvious from the face of the maps and the data in our record that serious violations of article III, section 21 of the Florida Constitution have occurred. Moreover, we have a constitutional duty to recognize these violations and require that the Senate plan be amended so that the new standards adopted by the citizens of Florida are effectuated. Indeed, we would be derelict in our obligation under the Florida Constitution if we were to ignore these violations. Contrary to the suggestion by the dissent, there is no joy or pleasure in this exercise; we follow the constitution as the will of the people of Florida.
In conclusion, I recognize that the Florida Constitution of 2012 contains more elements and standards for redistricting than it did a decade ago, and the citizens of Florida expect this Court to conduct a more detailed and probing review of legislative plans of reapportionment than ever before. While we as a Court must fulfill our constitutional obligations to the citizens of Florida to the fullest extent possible, our review must not extend beyond *692 that which our constitutional structure and the limited time allotted under the constitution permits. Today, this Court has attempted to maintain that delicate, proper balance and conducted only a limited facial review of the joint resolution through examination of the reapportionment maps and objective statistical data. Therefore, I concur with the decision of the majority to approve the plan submitted by the Florida House of Representatives, but reject the plan submitted by the Florida Senate.

. The drafting of the 1968 Florida Constitution occurred after three successive reapportionment plans were invalidated by the federal courts on the basis of equal protection violations. A federal district court ultimately assumed the responsibility for redistricting the State of Florida. See id. at 833-34 (Lewis, J., concurring); see also Swann v. Adams, 263 F.Supp. 225, 226-28 (S.D.Fla.1967) (noting the “[jJudicial apportionment of the Florida Legislature is required” and delineating a reapportionment plan that provided for 48 Senate districts and 119 House of Representative districts).