CANADY, C.J.,
concurring in part and dissenting in part.
I concur in the majority’s ruling that the redistricting plan for the House of Representatives is valid, but I dissent from the ruling that the plan for the Senate is invalid. With respect to the Senate plan, I conclude that the opponents have failed to overcome the presumption that a redistricting plan adopted by the Legislature is constitutional. Because it has not been shown that the Legislature’s choices in establishing the district lines in the Senate plan are without a rational basis under the applicable constitutional requirements, I would validate that plan.
I.
This Court has recognized that legislative enactments are ordinarily “clothed with a presumption of constitutionality.” Crist v. Fla. Ass’n of Criminal Def. Lawyers, Inc., 978 So.2d 134, 139 (Fla.2008). When the constitutional validity of a legislative enactment is challenged, “[t]o overcome the presumption [of constitutional validity], the invalidity must appear beyond reasonable doubt.” Id. (quoting Franklin v. State, 887 So.2d 1063, 1073 (Fla.2004)). We applied this presumption of constitutionality in our review of legislative redistricting plans in 1972, when we considered the first case in which we exercised our authority under article III, section 16 of the Florida Constitution. In that decision we specifically acknowledged the controlling principle that a legislative enactment should not be declared unconstitutional “unless it clearly appears beyond all reasonable doubt that, under any rational view that may be taken of the statute, it is in positive conflict with some identified or designated provision of constitutional law.” In re Apportionment Law Senate Joint Resolution No. 1305, 1972 Regular Session (In re Apportionment-1972), 263 So.2d 797, 805-06 (Fla.1972) (quoting City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. 769, 772 (1914)). We also “emphasize[d] that legislative reapportionment is primarily a matter for legislative consideration and determination” *696 and that “the fundamental doctrine of separation of powers and the constitutional provisions relating to reapportionment require that we act with judicial restraint so as not to usurp the primary responsibility for reapportionment, which rests with the Legislature.” Id. at 799-800.
In 2002 — in our most recent decision under article III, section 16 — we rejected the argument “that the Legislature’s joint resolution of apportionment is not presumptively valid.” In re Constitutionality of House Joint Resolution 1987 (In re Apportionment-2002), 817 So.2d 819, 825 (Fla.2002). We unequivocally reaffirmed the view we adopted in 1972, holding “that the joint resolution of apportionment identified in article III, section 16, Florida Constitution, upon passage is presumptively valid.” In re Apportionment-2002, 817 So.2d at 825.
In our 2002 decision we also stated that under article III, section 16, our review “is extremely limited.” In re Apportionment-2002, 817 So.2d at 824. Recognizing the inherent limitations of a review process conducted by an appellate court during a thirty-day period, we acknowledged that we can “only pass upon the facial validity of the plan.” Id. We specifically held that the article III, section 16, “proceeding before this Court is not the proper forum to address such a fact-intensive claim” as that presented by a claim under the Voting Rights Act of 1965, 42 U.S.C. §§ 1973-1978q (2006), or by a claim of political gerrymandering. In re Apportionment-2002, 817 So.2d at 831. The majority of the panel took the view that under article III, section 16, the Court had “not been afforded a structure to competently address claims that cannot be determined from the [redistricting] plan itself.” In re Apportionment-2002, 817 So.2d at 836 (Lewis, J., concurring).
With today’s decision, the majority of this Court effectively abrogates these precedents that recognized the circumscribed nature of the thirty-day review process under article III, section 16, and the presumption of constitutionality with which a legislative redistricting plan is clothed. The Court has now transformed the nature of the constitutional review process and cast aside the presumption of constitutionality. And it has done so in the absence of any argument from the opponents of the redistricting plan that we should recede from our precedent applying the presumption of constitutionality to redistricting plans.
The majority’s departure from our precedents is not justified by the adoption in 2010 of article III, section 21, Florida Constitution, which created certain additional “[standards for establishing legislative district boundaries.” Art. Ill, § 21, Fla. Const. Although section 21 unquestionably altered the scope of the issues to be considered in our review of a legislative redistricting plan, nothing in section 21 changed the structure or nature of the thirty-day review process previously existing under section 16. The text of section 21 does not explicitly address the judicial review process. And it is unwarranted to conclude that section 21 implicitly altered the structure or nature of the existing constitutional review process.
It may well be that some of those who supported the adoption of section 21 desired to transform the redistricting process from what this Court has previously acknowledged it to be — “primarily a matter for legislative consideration and determination” — into a matter controlled by the largely discretionary rulings of the majority of this Court. In re Apportionment-1972, 263 So.2d at 799-800. A different constitutional amendment to effect such a transformation in the redistricting process *697 might have been proposed for the consideration of Florida’s voters. But the voters who adopted section 21 could not have known — from the text of the proposed amendment, much less the ballot summary — that such a transformation would be brought about by the adoption of section 21.
Weighty reasons support adhering to our precedent establishing that redistricting plans adopted by the Legislature are presumed to be constitutionally valid and that this Court should “act with judicial restraint” in our review of such plans. In re Apportionment-1972, 263 So.2d at 800. In Perry v. Perez, — U.S. -, 132 S.Ct. 934, 941, 181 L.Ed.2d 900 (2012) — a case that was decided in January of this year presenting claims under the Voting Rights Act and the United States Constitution— the Supreme Court of the United States observed that “experience has shown the difficulty of defining neutral legal principles in this area, for redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches.” The Supreme Court recognized the importance of ensuring that the lower court act to vindicate federal rights “without displacing legitimate state policy judgments with the court’s own preferences.” Id. Although these observations in Perry are no doubt based in part on federalism concerns, it is clear that Perry’s concern about the “difficulty of defining neutral legal principles” to ensure that the “policy judgments” of the “the elected branches” are not displaced by judicial “preferences” is applicable to not only federal but also state judicial intervention. Id.
The concerns voiced by the Supreme Court in Perry echo concerns articulated in prior decisions where the Supreme Court considered the definition of “discernible and manageable standards by which political gerrymander cases are to be decided.” Davis v. Bandemer, 478 U.S. 109, 123, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). Although a narrow majority of the Supreme Court has recognized the possibility of articulating such standards, a majority of the Supreme Court has never been able to agree on a particular test or set of tests.
In Vieth v. Jubelirer, 541 U.S. 267, 306-07, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring in the judgment), Justice Kennedy recognized the “obstacle[]” presented by the continuing “absence of rules to limit and confine judicial intervention” in the adjudication of political gerrymandering claims: “With uncertain limits, intervening courts — even when proceeding with best intentions — would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.” In his opinion for the plurality in Vieth, Justice Scalia emphasized the importance of a solid and demonstrable criterion “to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts’ intrusion into a process that is the very foundation of democratic decisionmaking.” 541 U.S. at 291, 124 S.Ct. 1769 (plurality).
“The term ‘political gerrymander’ has been defined as ‘[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape to give one political party an unfair advantage by diluting the opposition’s voting strength.’ ” Id. at 271 n. 1, 124 S.Ct. 1769 (quoting Black’s Law Dictionary 696 (7th ed. 1999)). A political gerrymandering claim is thus akin to a claim under section 21 that a district has been “drawn with the intent to favor or disfavor a political party or an incumbent.” Art. Ill, § 21(a), Fla. Const. And the concerns regarding “discernible and manageable standards,” Ban *698 demer, 478 U.S. at 123, 106 S.Ct. 2797, to be utilized by judges in determining the validity of political gerrymandering claims are directly applicable to the context of an improper intent claim under section 21.
The justification for the rule of deference embodied in the presumption of constitutionality is not vitiated by the adoption of the particular standards contained in section 21. As the foregoing discussion shows, the justification for deference has a firm, widely acknowledged grounding with respect to the portion of section 21(a) that prohibits conduct akin to the conduct at issue in a political gerrymandering claim. The justification for deference also has a compelling basis with respect to the parts of section 21(b) concerning compactness and the use of existing political and geographical boundaries. Those standards do not embody inflexible, determinate requirements eliminating the exercise of legislative policy judgments in making the choices necessary to draw district lines.[67] By their very nature, those standards permit a range of choice by the Legislature in the drawing of district boundaries. Given that reality, the application of nondeferen-tial review to the plan drawn by the Legislature after the Legislature has “weighed and evaluated” the proper balancing of the different “criteria and standards” of section 21(b), creates the danger of “displacing legitimate [legislative] policy judgments with the court’s own preferences.” Perry, 132 S.Ct. at 941.
The circumscribed nature of the thirty-day constitutional review process provides an additional compelling reason for not abandoning the rational-basis review required by our precedent and the acknowl-edgement that our review “is extremely limited.” In re Apportionment-2002, 817 So.2d at 824. We conduct the constitutional review process as an appellate court without the benefit of any fact-finding proceedings. We can only rely on facts that are undisputed. It is impossible for us to thoroughly evaluate disputed fact-intensive issues. We have previously recognized that the adjudication of claims arising from the provisions of the Voting Rights Act— which are analogous to the provisions of section 21(a) protecting the rights of “racial or language minorities”- — often involve a “fact-intensive” inquiry which cannot be undertaken within the limits of our review pursuant to section 16. In re Apportionment-2002, 817 So.2d at 829. We are similarly constrained in the evaluation of factual issues relevant to a determination of improper intent. Given the structural *699 limitations imposed on our review, adherence to the presumption of constitutionality helps ensure that we avoid reliance on suspicion and surmise — rather than adjudicated facts — as a basis for declaring a redistricting plan constitutionally invalid.
These considerations point to the wisdom of adhering to our precedent that clothes a redistricting plan with a presumption of constitutionality and prevents us from declaring a plan invalid unless it is clear that “under any rational view that may be taken of the [redistricting plan], it is in positive conflict with” the requirements of our constitution. In re Apportionment-1972, 263 So.2d at 806 (quoting Bowden, 64 So. at 772). Failing to adhere to that precedent creates the risk of having our decisions adjudicating the validity of redistricting plans decline into a species of “ ‘it-is-so-because-we-say-so’ jurisprudence.” [68]
II.
Reasonable questions and concerns can certainly be raised about certain choices the Legislature made in drawing district lines. But the proper analysis of constitutionality cannot be driven by questions and concerns. Instead, under our precedents, the analysis of constitutionality must focus on whether there is a rational relationship between the choices made by the Legislature and the constitutional standards. The majority, however, takes a very different approach than the approach required by our precedents.
The foundation of the majority’s decision is constructed from three interrelated elements: (1) the effective repudiation of the presumption of constitutionality and the rational-basis scrutiny it entails; (2) the imposition of judicially created extra-constitutional constraints on the Legislature’s utilization of political and geographical boundaries in the drawing of district lines; and (3) conclusions of fact based solely on suspicion and surmise.
The majority acknowledges the presumption of constitutionality but carries out its review of the Senate district plan in a manner that is heedless of the limits imposed by that presumption. The majority thus applies a strict-scrutiny analysis rather than the rational-basis review required by our precedents.
The majority imposes a requirement to use “consistent” boundaries, majority op. at 656, 663, in the drawing of district lines — a requirement that is nowhere to be found in the text of section 21 and that cannot reasonably be implied from the text. This judicial requirement of “consistent” utilization of boundaries has far-reaching consequences and is subject to no “rules to limit and confine judicial intervention.” Vieth, 541 U.S. 267, 307, 124 S.Ct. 1769 (Kennedy, J., concurring in the judgment).
Based on nothing more than suspicion and surmise, the majority concludes that certain district lines were drawn with improper intent — when there is an evident, rational, permissible basis for the drawing of those lines. The majority fails to recognize the structural limitations of our review process, which preclude the adjudication of fact-intensive claims.
The most salient legal consequence of the majority’s decision is that we can no longer say that the “primary responsibility for [redistricting] ... rests with the Legislature.” In re Apportionment-1972, 263 So.2d at 800. The most salient practical consequence of the majority’s decision is the unsettling of four minority Senate dis *700 tricts — Districts 6, 12, 14, and 34 — drawn by the Legislature to ensure compliance with the requirement of the constitution that districts “not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice.” Art. Ill, § 21(a), Fla. Const.
The majority’s opinion leaves much in a state of uncertainty. As the majority acknowledges, in their initial brief, the League of Women Voters of Florida, the National Council of La Raza, and Common Cause Florida (“Coalition”) stated that if “this Court finds that any or all of [the constitutional] standards are breached, the non-compliant plans should be returned to the Legislature with clear instructions as to how to remedy the breach.” Brief of the Coalition at 16, In re Joint Resolution of Reapportionment, No. SC12-1 (Feb. 17, 2012) (emphasis added). As the discussion to follow shows, the majority has failed to consistently provide such clarity.
III.
I now turn to the grounds relied on by the majority for invalidating the Senate Plan. First, I will address why the majority’s decision to invalidate the numbering of Senate districts adopted by the Legislature is unwarranted under section 21. Next, I will discuss the specific districts in the Senate plan with which the majority finds fault. With respect to each of these districts, neither the opponents nor the majority have shown the absence of a rational basis under the constitutional standards for the lines drawn by the Legislature. Finally, I will explain my disagreement with the majority’s comments regarding the City of Lakeland’s challenge.
Senate District Numbering
I would reject the challenge to the numbering of districts in the Senate plan. Section 21 is a limitation on the power of the Legislature only with respect to “establishing legislative district boundaries.” Art. Ill, § 21, Fla. Const. The prohibition on action to “favor or disfavor ... an incumbent” applies only to the manner in which district lines are “drawn.” Art. Ill, § 21(a), Fla. Const. The numbering of the Senate districts is totally unrelated to any advantage incumbent senators will obtain vis-á-vis challenger candidates. The majority stretches the text of section 21 to reach legislative decisions that are not within the scope of section 21.
Senate Districts 1 and 3
The majority contends that Senate Districts 1 and 3 were drawn without respecting any consistent political or geographical boundary lines and that the districts are not compact. The majority rejects as illegitimate the Legislature’s asserted interest in maintaining a coastal community of interest in one district and a rural community of interest in the other district. The majority also asserts that the configuration of the districts shows that they were drawn improperly to favor the incumbent senators from each of the districts. The majority’s analysis with respect to these districts illustrates how it has cast aside the presumption of constitutionality and departed from the proper confines of our limited review.
Section 21 provides that “districts shall, where feasible, utilize existing political and geographical boundaries.” Art. Ill, § 21(b), Fla. Const. This provision does not require that the Legislature make a choice between using either political boundaries or geographical boundaries. Indeed, the text clearly contemplates that both political and geographical boundaries will be utilized. The majority, however, *701 imposes a requirement of consistency that is designed to limit the exercise of policy judgment by the Legislature under section 21. See majority op. at 656, 663. This is a purely judicially created extra-constitutional requirement. It amounts to a judicial assertion that the constitution is violated if political boundaries and geographical boundaries are not utilized in a fashion that suits judicial sensibilities. It cannot be reconciled with the text of section 21.
In the context of legislative districting, compactness will necessarily be a matter of degree. It is not a standard that is subject to a neat, objective test. On the contrary, the requirement is inherently vague. (The requirement that districts be compact is akin in its vagueness to a rule of court requiring that appellate briefs be brief.) In section 21, the compactness standard is on an equal footing with the standards related to equal population and the utilization of political and geographical boundaries. The Legislature thus may exercise its policy judgment to utilize political and geographical boundaries even when doing so may result in a district that is less compact than it might otherwise be.
In the case of Senate Districts 1 and 3, the Legislature’s choice to utilize certain political boundaries and geographical boundaries has resulted in the creation of districts that are less compact than many other districts in the Senate plan. It cannot be said, however, that the drawing of the district lines for Districts 1 and 3 has no rational basis related to the constitutional standards.
The majority’s rejection of the Legislature’s consideration of communities of interest is wholly unwarranted. Nothing in section 21 provides that the standards set forth there — along with those in section 16 — are the exclusive, legitimate considerations that may be taken into account by the Legislature in drawing district lines. “[Mjaintaining communities of interest” has been recognized as a “traditional dis-tricting principle[ ].” Bush v. Vera, 517 U.S. 952, 977, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). Although the Legislature is not constitutionally required to maintain communities of interest, nothing in the constitution precludes the Legislature from giving consideration to such a traditional districting principle. The voters adopting section 21 would have had no way of knowing — either from the text of the amendment or the ballot summary — that the proposed amendment would preclude the Legislature from considering existing communities of interest. Such a limitation on legislative authority should not be read into the constitution by implication.
Finally, the majority’s conclusion that these districts were drawn with an improper intent to favor the incumbent senators is based on suspicion and surmise. It is indeed ironic that the majority relies on this factor as a ground for invalidating these districts when the only alternative Senate district map submitted to the Court reconfigures these districts but in a way that also maintains the two incumbent senators in different districts.
Senate Districts 6 and 9
The Senate cogently describes the challenge to Senate District 6 as based on the assertion that
the Legislature (or this Court) should engage in a deliberate effort to dismantle functioning minority districts and replace them with districts with cognizably lower minority voting age population (VAP), without a shred of evidence either that the lower numbers will not “diminish” minority voters!’] “ability to elect” or any evidence (or even credible allegation) that these gratuitous reductions will enhance minority (as opposed to Democratic) opportunities elsewhere.
*702 Reply Brief of the Florida Senate at 6-7, In re Joint Resolution of Reapportionment, No. SC12-1 (Feb. 23, 2012).
In accepting this unwarranted challenge, without the benefit of any fact-finding proceeding on the contested retrogression issue, the majority decides that — based on the subordinate compactness standard — it is empowered to make an ad hoc determination concerning how much minority voting strength can be diminished without transgressing the unequivocal constitutional prohibition on drawing district lines “to diminish” the “ability” of “racial or language minorities” “to elect representatives of their choice.” Art. Ill, § 21(a), Fla. Const. This can be reconciled with neither the plain meaning of diminish — “to make less or cause to appear less,” Webster’s Third International Dictionary 634 (1993) — nor the law interpreting the analogous provision in section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (2006).
Relying on an alternative proposed by the Coalition, the majority thus concludes that District 6 could be reconfigured by reducing its black VAP from 47.7 percent in the Legislature’s plan to a black VAP of 42.4 percent in the Coalition’s plan. Majority op. at 666-67, 667-68. Under the majority’s approach, the current functioning minority district will be replaced by a district in which the 2006 Democrat candidate for governor received less than a majority of the vote. By comparison, in both the benchmark district and the district adopted by the Legislature the 2006 Democrat candidate for governor obtained a majority. The differences in performance admittedly are not large, but the differences are at the margin where many elections are decided.[69] The Legislature undoubtedly had a rational basis for the conclusion that the configuration of District 6 as adopted was necessary to avoid prohibited retrogression in the ability of blacks to elect a representative of choice.[70] Blithely observing that the justification for Senate District 6 under the nonretrogression rule is “questionable,” the Court substitutes its determination for the judgment of the Legislature. Majority op. at 683. In doing so, the majority ignores the presumption of constitutionality and the constitutional priority given to the protection of “racial or language minorities.” See Art. Ill, § 21(a), Fla. Const.
*703 The majority also ignores the findings of the three-judge panel in Martinez v. Bush, 234 F.Supp.2d 1275, 1298-99 (S.D.Fla.2002), that “[tjhere is a substantial degree of racially polarized voting in ... northeast Florida” and that
[i]n any district in [that area] in which blacks do not comprise a majority or near majority of actual voters, it is likely that the black candidate of choice (if different from the candidate of choice of non-black voters) will not often prevail; instead, the candidate of choice of non-black voters will prevail.
Such findings are highly relevant to the “functional analysis” of retrogression to which the majority refers. See, e.g., majority op. at 625, 654, 656. Contrary to the majority’s conclusion, there is no reliable functional analysis establishing that the alternative district mandated today by this Court is a district that ensures that the ability of black voters to elect a senator “of their choice” is not diminished. Art. Ill, § 21(a), Fla. Const. And the majority has cited no case authority under section 5 of the Voting Rights Act in which a district plan was upheld against a retrogression challenge where a choice was made to reduce the minority VAP in a performing minority district in a manner similar to that mandated by the Court today.
The alternative district proposed by the Coalition is unquestionably more compact than Senate District 6. But the compactness standard of section 21(b) is unquestionably subordinate to the requirements of section 21(a) that protect the rights of minority voters. By mandating the creation of a more compact district in which the voting influence of black voters is diminished, the majority fails to give effect to the constitutional protection for minority voters required by section 21(a).
The majority recognizes that the configuration of District 9 flows from the configuration of District 6 in the Legislature’s plan and invalidates District 9 based on the conclusion that Districts 6 is invalid. Because I disagree with the conclusion regarding District 6, I also disagree with the conclusion regarding District 9.
Senate Districts 10 and 12
The majority invalidates Senate District 10 based on suspicion, surmise, and speculation. Suspicion and surmise are the predicates for the conclusion that District 10 was drawn with an improper intent to favor the incumbent senator. Speculation is the predicate for the conclusion that District 12 — drawn to protect the rights of minority voters in a performing minority district — might have been drawn in a different manner without retrogressing.
The reality is that the configuration of Senate District 10 can reasonably be understood to result directly from the drawing of District 12 as a nonretrogressive district where there is currently a performing black district, together with the drawing of District 14 as a new Hispanic-majority district with a Hispanic VAP of 50.5 percent. No one has challenged and the majority does not question the configuration of District 14, the new Hispanic-majority district. With respect to District 12, the majority faults the Legislature for failing to perform a “functional analysis.” Majority op. at 671. In contrast with what it offered as a rationale for its decision with respect to District 6, the majority provides no analysis with respect to the maintenance of black voters’ ability to elect the candidate of their choice in District 12 and fails to suggest any alternative configuration for District 12 that it would deem to be nonretrogressive.
The majority’s opinion with respect to Districts 10 and 12 can only be described as conclusory. It illustrates as vividly as *704 anything in the opinion how the majority’s acknowledgment of the presumption of constitutionality is meaningless. Rather than reviewing the persuasiveness of the opponents’ allegations of unconstitutionality, the majority puts the burden on the Legislature to affirmatively prove constitutionality and then invalidates District 10 because “[njothing in the record reflects that the process of drawing the districts in this area recognized the importance of balancing the constitutional values.” Majority op. at 671-72. And by failing to articulate a clear rationale that would guide the Legislature in remedying the supposed constitutional violation, the majority makes it more likely that the Court will ultimately determine that it must draw the district lines for the Florida Senate.
Senate District 30
The majority invalidates Senate District 30 based on the conclusion that the district is not compact and was drawn with an improper intent to favor the incumbent senator. The majority faults the district for having an “odd-shaped configuration.” Majority op. at 672. As it did with respect to Districts 1 and 3, the majority dismisses the legitimacy of the Legislature’s consideration of a coastal community of interest in the fashioning of District 30. I reject the majority’s conclusion with respect to the utilization of a coastal community of interest for the reasons I previously expressed in the discussion of Districts 1 and 3. In addition, the majority gives short shrift to the impact on District 30 of the configuration of adjoining District 40, which flows from the requirements of section 5 of the Voting Rights Act. The boundary between Districts 30 and 40 constitutes roughly one-third of the 313-mile perimeter of District 30. And the majority fails to reckon with the reality that the coastal geography of Florida will necessarily result in some districts with an odd-shaped configuration. The objectors have not overcome the presumption of constitutionality with which Senate District 30 is clothed.
Senate Districts 29 and 34
The majority declares Senate Districts 29 and 34 invalid on the ground that they are not compact. The majority concludes that the configuration of both districts is driven by an improper intent to favor the incumbent senator in District 29. The majority relies on an alternative majority black district suggested by the Coalition to show that District 34 could have been drawn in a different fashion to meet the requirement of nonretrogression. This alternative majority black district has a configuration which is itself far from neatly compact. Here, the majority once again-based on suspicion and surmise regarding improper intent — simply substitutes its judgment for the Legislature’s judgment, without any showing that the judgment of the Legislature is not rationally related to the requirements of the constitution.
The City of Lakeland
The majority has neither accepted nor rejected the challenge made to the Senate district plan by the City of Lakeland. Instead, the majority expresses its “concerns.” Majority op. at 683. This is no way to adjudicate a claim of constitutional invalidity.
The City essentially argues that section 21 precluded the Legislature from dividing the City into two different Senate districts. I would reject this argument. Nothing in section 21 prohibits the Legislature from drawing district lines through municipalities. The reality is that many municipalities will necessarily be divided by legislative district lines. The district line drawn through the City of Lakeland largely follows geographical boundaries — including Interstate 4 and United States Highway 98. In order to accept the City’s argu *705 ment, this Court would simply have to substitute its preference for the policy choice made by Legislature. The presumption of constitutionality enjoyed by the districting plan precludes this result. The City has failed to establish that the Senate district line which traverses the City is not rationally related to the standards of Florida’s Constitution.
For reasons I have already explained, I disagree with the majority’s condemnation — in its discussion of the City of Lake-land’s claim — of the Senate’s use of “an inconsistent definition of ‘political and geographical boundaries.’ ” Majority op. at 688. I also disagree with the majority’s condemnation of the Senate’s supposed “incorrect understanding of both compactness and utilizing political and geographical boundaries.” Id. Any suggestion that the use of geographical boundaries is somehow less acceptable than the use of political boundaries is totally at odds with the text of section 21, which establishes no preference for political over geographical boundaries. Any suggestion that the Legislature must choose between political and geographical boundaries and consistently follow that choice is likewise totally at odds with the text of section 21, which does not expressly require such consistency and cannot reasonably be understood as implying a requirement of such consistency.
IV.
In the majority’s analysis, the presumption that redistricting plans adopted by the Legislature are constitutional — a presumption that this Court unanimously reaffirmed ten years ago — is a quickly vanishing presumption. “As the cloud is consumed and vanisheth away,”[71] so goes the presumption of constitutionality — consumed by the majority’s striet-scrutiny analysis. I dissent from this unwarranted expansion of the power of this Court.
POLSTON, J„ concurs.

. The requirement from section 21(b) that "districts shall be as nearly equal in population as is practicable” does lend itself to a determinate test. In Brown v. Thomson, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (quoting Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)), the Supreme Court determined that the requirement from the Equal Protection Clause of the Fourteenth Amendment that electoral districts be "as nearly of equal population as is practicable” allowed "minor deviations from mathematical equality.” The Supreme Court then concluded that "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations.” Id. In adopting the amendment that has been codified in section 21, the people of Florida chose to add to their constitution the well-defined phrase "of nearly equal population as practicable.” Because it uses the identical language as the prior cases interpreting the equal population requirement under the Fourteenth Amendment, the equal population standard of section 21(b) must be interpreted in accordance with those well-established precedents. Cf. Fla. Dep’t of Revenue v. City of Gainesville, 918 So.2d 250, 263 (Fla.2005) ("In the absence of any indication in the Constitution to the contrary, we conclude that the term ‘municipal or public purposes' [as used in a newly enacted statute] should be construed in accordance with the definition utilized by the Court in its prior decisions.”).

. Webster v. Reprod. Health Servs., 492 U.S. 490, 552, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (Blackmun, J., concurring in part and dissenting in part).

. Pursuant to calculations performed by the software purchased by this Court, in District 1 of the 2002 Benchmark Senate Plan, 54.49 percent of voters selected the Democrat candidate for governor (Jim Davis) in the 2006 gubernatorial election, while 43.28 percent of voters selected the Republican candidate (Charlie Crist). In the Legislature’s proposed District 6, 52.02 percent of voters selected the Democrat in that election and 45.71 percent selected the Republican. In contrast, in the Coalition’s District 1, only 49.06 percent of voters selected the Democrat and 48.61 percent selected the Republican. And, ironically, in its appendix, the Coalition offered an even less persuasive figure. The Coalition asserted that only 48.1 percent of voters in its proposed District 1 voted for the Democrat in the 2006 gubernatorial election.

. I wholeheartedly agree with the view— cited by the majority — articulated in Shaw v. Reno, 509 U.S. 630, 657, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), that "[rjacial classifications of any sort pose the risk of lasting harm to our society.” I also agree with the majority’s rejection of “any argument that the minority population percentage in each district as of 2002 is somehow fixed to an absolute number under Florida’s minority protection provision.” Majority op. at 627. Although the nonretrogression provision of section 21(a) does not require the Legislature to draw covered minority districts in a manner that rigidly preserves or increases the minority VAP with each redistricting, the doctrine of nonretrogression does require the Legislature to draw the boundaries of performing minority ability districts so that the districts will continue to perform as minority ability districts.

. Job 7:9 (King James).